# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Criminal No. 15-165 (JRT/LIB) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER ADOPTING REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE** |
| (2) WILLIAM DAVID ALONZO and (7) TIMOTHY JOSEPH BEAULIEU, JR., | |
| Defendants. | |

Deidre Y. Aanstad and Melinda A. Williams, Assistant United States Attorneys, **OFFICE OF THE UNITED STATES ATTORNEY**, 600 United States Courthouse, 300 South Fourth Street, Minneapolis, MN 55415, for plaintiff.

Frederic K. Bruno and Samantha J. S. Foertsch, **BRUNO LAW, PLLC**, 5500 Wayzata Boulevard, Suite 1000, Minneapolis, MN  55416, for defendant Alonzo.

Phyllis O. Tousey, **SWANSON, DROBNICK & TOUSEY, LLP**, 3120 Woodbury Drive, Suite 200, Woodbury, MN  55125, for defendant Beaulieu.

In May 2015, defendants Timothy Joseph Beaulieu, Jr., and William David Alonzo were indicted on charges that they violated federal drug and firearm laws. Defendants move to suppress evidence obtained during a traffic stop and canine sniff search, as well as statements they made during subsequent custodial interrogations. Alonzo also moves to sever his case.  On December 3, 2015, United States Magistrate Judge Leo I. Brisbois issued a Report and Recommendation ("R&R") recommending that the Court deny Defendants' motions.  Defendants now object in part to the R&R.

Based on a *de novo* review, the Court finds that law enforcement officers had both probable cause to initiate the traffic stop and a reasonable articulable suspicion, based on the doctrine of collective knowledge, to justify extending the stop to conduct the canine sniff search. The Court also finds that the Magistrate Judge's recommendation that Alonzo's motion to sever be denied was not clearly erroneous because Alonzo has failed to meet his high burden of showing that joinder will impermissibly infringe on his right to a fair trial. The Court will therefore overrule Defendants' objections, adopt the R&R to the extent it is consistent with this Order, and deny Defendants' motions in their entirety.

## BACKGROUND

In October 2014, Drug Enforcement Agency ("DEA") Task Force Officer Thomas Maloney joined an investigation relating to a recently executed search warrant on the Red Lake Indian reservation in which federal law enforcement officers seized approximately 1,500 grams of heroin. (Mot. Hr'g Tr. at 64:1-9, Dec. 22, 2015, Docket No. 1,128.) Pursuant to the investigation, officers obtained authorization to intercept telephone communications made and received by co-defendant Omar Sharif Beasley. (*Id.* at 64:13-25.) Through these intercepts, Maloney learned that Beasley had traveled to Detroit, Michigan, in an attempt to obtain approximately 500 grams of heroin to bring back to Minnesota. (*Id.* at 65:25-66:17.)

On March 9, 2015, Maloney and other investigating officers intercepted cell tower information indicating that Beasley was traveling to the Minneapolis area. (*Id.* at 66:18-67:1.) A group of approximately ten officers separated to search various areas around

Minneapolis for Beasley.  (*Id.* at 68:2-13.)  Later that day, officers located Beasley and a group of his associates at the Quality Inn Hotel in Brooklyn Center, Minnesota.  (*Id.* at 69:6-10.)

At approximately 10 p.m. that evening, Maloney observed the group members exit the hotel.  (*Id.* at 70:22-71:23.)  The group members carried a variety of bags, which they placed in the cargo areas of three vehicles parked outside – a white BMW, a gold Pontiac, and a tan Jeep Cherokee with Red Lake Nation license plates.  (*Id.* at 71:1-13.)  After loading the bags, the group members entered the three vehicles, exited the parking lot together, and headed north on Interstate 94 towards Saint Cloud, Minnesota.  (*Id.* at 73:5-9.)  All three vehicles later turned together onto northbound Minnesota Highway 10.  (*Id.* at 74:6-8.)

During prior interviews with informants and co-conspirators, Maloney learned that Beasley and his associates typically operated in a three-vehicle system with one vehicle responsible for transporting the drugs, one vehicle responsible for transporting Beasley as the overseer of the operation, and one vehicle responsible for carrying a firearm to protect the drugs being transported.  (*Id.* at 75:2-13.)  With this in mind, Maloney determined that the vehicle most likely to be carrying the drugs was the Jeep, because it was a non-local vehicle that was not associated with any of the investigation's primary targets, it stopped for gas, and it was carrying the most bags.  (*Id.* at 75:16-76:6.)

Maloney contacted Minnesota State Highway Patrol Trooper Michael Flanagan to set up a "wall" stop of the Jeep.  (*Id.* at 76:7-14.)  A "wall" stop is a stop in which law enforcement officers find an independent basis for stopping an individual so as to not

reveal or expose the existence of a larger investigation. (*See id.* at 74:15-20) Maloney informed Flanagan that the Jeep was involved in a DEA narcotics investigation and was suspected of carrying illegal narcotics and asked him to assist with a potential stop of the vehicle. (*Id.* at 41:8-42:4, 76:7-14.) Flanagan told Maloney that he would travel towards Saint Cloud, and provided Maloney with the phone number of another highway patrol trooper, Christopher James, who was closer to the location of the Jeep. (*Id.* at 76:23-77:7.) Maloney's partner, Special Agent Travis Oken, called James, informed him that the Jeep was suspected of transporting heroin, and instructed James to initiate a traffic stop if he witnessed any traffic violations. (*Id.* at 8:25-9:9, 77:2-7.)

James located the Jeep as he was traveling northbound on Minnesota Highway 10 in Benton County. (*Id.* at 8:13-24.) While following the Jeep, James observed the vehicle drift onto the fog line, then onto the center line, and back onto the fog line again. (*Id.*) The Jeep eventually drove past an onramp illuminated by streetlights, allowing James to see two people inside the Jeep, a driver and a right rear passenger. (*Id.*) James also observed that the right rear passenger was not wearing a seatbelt – the seatbelt strap was hanging unsecured. (*Id.* at 8:20-23, 26:25-28:3.) Based on these observations, James turned on his emergency lights and initiated a traffic stop on the Jeep. (*Id.* at 8:20-24, 11:4-5.)

The Jeep traveled approximately a quarter of a mile before actually pulling over. (*Id.* at 11:4-10.) Once the Jeep stopped, James exited his squad car to approach the driver's side. (*Id.* at 11:13-18.) As James approached, he observed that the front

passenger seat was empty and that both the driver and the rear passenger had freshly-lit cigarettes. (*Id.*)

James first attempted to speak to the driver, whom he identified as Beaulieu. (*Id.* at 11:18-20.) Beaulieu told James that the reason why the Jeep touched the center and fog lines was because he was trying to locate his cigarettes. (*Id.* at 12:3-6.) He also told James that the rear passenger, later identified as Alonzo, was sitting in the back because cold air blew into the car on the front passenger side. (*Id.* at 28:4-8.) As James attempted to speak with Beaulieu, however, Alonzo interrupted and tried to talk for Beaulieu. (*Id.* at 11:20-22.) James learned through Alonzo's interruptions that Defendants had met up in the Twin Cities, went shopping at Macy's, and were heading back to the Red Lake area. (*Id.* at 12:12-15.) James found it unusual that Alonzo kept interrupting Beaulieu to answer James' questions. (*Id.* at 12:16-23.) As James walked back to his squad car to run Defendants' driver's licenses, he peered into the back of the Jeep but did not see any Macy's shopping bags. (*Id.* at 15:12-15.)

Flanagan arrived on scene shortly after James initiated the traffic stop and was standing by James's squad car when James returned to run the licenses. (*Id.* at 13:21-14:3.) Flanagan had with him a narcotics detection dog named Layka, who is trained to detect marijuana, cocaine, heroin, methamphetamine, and mushrooms. (*Id.* at 36:8-38:15.) James told Flanagan that during his initial encounter with Beaulieu and Alonzo, they both had freshly lit cigarettes, Alonzo was sitting in the back seat of the Jeep despite the unoccupied front passenger seat, Alonzo interrupted Beaulieu to answer James' questions, and he could not see any Macy's bags in the back of the Jeep despite Alonzo's

statement that the two had previously shopped there.  (*Id.* at 15:7-15, 44:21-45:11.)  He also advised Flanagan that Beaulieu and Alonzo said that they were traveling from the Minneapolis metro area to the Red Lake Indian Reservation.  (*Id.* at 44:22-25.)  Due to his past experience, Flanagan knew that the Minneapolis metro area is a source location for illegal narcotics for the Red Lake Indian reservation.  (*Id.* at 45:7-11.)  Flanagan also knew from his earlier contact with DEA Task Force Officer Maloney that the Jeep was potentially transporting illegal narcotics.  (*Id.* at 41:8-42:4, 76:7-14.)  Based on all of this information, Flanagan told James that he believed that they had reasonable suspicion to conduct an exterior canine sniff search of the vehicle.  (*Id.* at 45:16-23.)  The troopers decided to ask Beaulieu for consent to search the Jeep, but planned to conduct a sniff search of the vehicle's exterior even if he refused.  (*Id.*)  James returned to the Jeep and asked Beaulieu to step out of the vehicle, issued him a written warning, and asked if he would consent to a search of the Jeep.  (*Id.* at 14:6-20.)  Beaulieu did not consent to a search.  (*Id.*)

Flanagan then walked over to Alonzo and asked him to step out of the Jeep.  (*Id.* at 47:22-47:5.)  While speaking to Alonzo, Flanagan smelled marijuana coming from the interior of the Jeep.  (*Id.*)  Flanagan retrieved Layka from his squad car and walked Layka around the exterior of the Jeep to conduct a canine sniff search.  (*Id.* at 46:1-14.)  Layka indicated that she detected narcotics inside the Jeep.  (*Id.*)  Flanagan then put Layka inside the Jeep, where she continued to exhibit behaviors indicating that she detected narcotics.  (*Id.* at 48:12-49:6.)

The troopers then searched the Jeep themselves. (*Id.* at 50:1-23.) They discovered a white garbage bag in the rear compartment, which contained a 9-millimeter handgun, 9-millimeter ammunition, a black digital scale, two packages of heroin wrapped in black electrical tape, and a baggy containing different prescription pills. (*Id.*) They also discovered two clear plastic baggies containing marijuana in the passenger compartment. (*Id.*) Flanagan took all of these items into his custody and transported them to Maloney and Oken. (*Id.* at 50:24-51:9.) The troopers then arrested Beaulieu and Alonzo, and transported them to the Benton County Jail. (*Id.* at 16:18-17:1.)

On March 10, 2015, Maloney and Oken went to the Benton County Jail to interview Beaulieu and Alonzo. (*Id.* at 79:2-12.) They interviewed Beaulieu first. (*Id.* at 80:7-80:8.) Beaulieu cooperated, but Maloney did not believe that his answers were candid. (*Id.* at 84:3-6.) They then interviewed Alonzo. (*Id.* at 86:14-91:14.) After initially telling a story that he admitted was untrue, Alonzo eventually told Maloney that he traveled from Detroit to Minnesota after purchasing pills from various "crack heads" in Detroit; that he knew there was heroin inside the black electrical taped bundles; and that he had purchased the gun seized during the traffic stop. (*Id.*) After the interviews, Beaulieu and Alonzo were released from the Benton County Jail. (*Id.* at 92:9-19.)

On May 20, 2015, Beaulieu and Alonzo were indicted on charges of conspiracy to distribute heroin, methamphetamine, oxycodone, hydromorphone, hydrocodone, and methadone; possession with intent to distribute heroin; possession with intent to distribute hydrocodone, methadone, and oxycodone, and possession of a firearm during and in relation to a drug trafficking crime. (Indictment, May 20, 2015, Docket No. 1.)

On May 27, 2015, officers arrested numerous individuals involved in Beasley's organization.  (Mot. Hr'g Tr. at 93:3-7.)   Maloney and another task force officer interviewed Beaulieu a second time.  (*Id.* at 93:9-97:11.)  During this interview, Beaulieu told officers that he became a driver for Beasley in the fall of 2014.  (*Id.* at 95:24-96:2.) Beaulieu said he believed that the passengers he drove were transporting money.  (*Id.* at 96:6-9.)  With regard to the March 9, 2015, traffic stop, Beaulieu stated that he had traveled with Alonzo from Red Lake to the hotel in Brooklyn Center, Alonzo paid for the hotel room and for gasoline, and he witnessed Beasley and others at the hotel mixing approximately 75 to 100 grams of heroin into 200 grams.  (*Id.* at 96:21-97:5.)

On August 10, 2015, Alonzo filed a number of pretrial motions, including a Motion for Severance or, in the Alternative, to Join the Co-Defendant's Motions; a Motion to Suppress Evidence Found in Vehicle; and a Motion to Suppress Defendant's Statements, Admissions, and Answers.  (Alonzo's Pretrial Mots., Aug. 10, 2015, Docket Nos. 669, 671-72.)  Beaulieu also filed a Motion to Suppress Evidence and Statements. (Beaulieu's Mot. to Suppress Evid. & Statements, Sept. 30, 2015, Docket No. 855.)

On December 3, 2015, the Magistrate Judge issued an R&R and order recommending that the Court deny the suppression and severance motions, and denying Alonzo's motion to adopt Beaulieu's pretrial motions.  (Order & R&R at 27, Dec. 3, 2015, Docket No. 1,057.)  The Magistrate Judge found that the initial traffic stop was lawful because James had, at a minimum, an objectively reasonable articulable suspicion of a criminal activity when he stopped the Jeep based on his observation that Alonzo did not appear to be wearing a seatbelt.  (*Id.* at 13-15.)  The Magistrate Judge also found that

the extension of the traffic stop was lawful because James' observations prior to giving Beaulieu a written warning, taken as a whole, were "independent articulable facts that created an objectively reasonable suspicion of additional criminal activity sufficient to prolong the stop very briefly." (*Id.* at 15-18.)  Because the Magistrate Judge concluded that the initial traffic stop and the extension of the stop were lawful, the Magistrate Judge further found that Beaulieu and Alonzo's subsequent custodial statements should not be suppressed as fruits of the poisonous tree.  (*Id.* at 19.)  Additionally, the Magistrate Judge concluded that Alonzo could not sever his case at this early stage because he did not meet his burden of showing prejudice caused by joinder.  Finally, the Magistrate Judge found that Alonzo could not join his co-defendant's pretrial motions.[1]  (*Id.* at 22-26.)  Beaulieu and Alonzo now object to the R&R.  (Beaulieu's Objs. to R&R, Dec. 17, 2015, Docket No. 1,109; Alonzo's Objs. to R&R, Dec.17, 2015, Docket No. 1,110.)

## ANALYSIS

### I.   STANDARD OF REVIEW

For a dispositive matter such as a motion to suppress evidence, "[t]he district judge must consider de novo any objection to the magistrate judge's recommendation. The district judge may accept, reject, or modify the recommendation, receive further evidence, or resubmit the matter to the magistrate judge with instructions." Fed. R. Crim. P. 59(b)(1), (3); *see also* 28 U.S.C. § 636(b)(1).  For a non-dispositive matter such as a

---

[1] Alonzo has not objected to the Magistrate Judge's order denying his motion to adopt Beaulieu's pretrial motions.  Therefore, the Court will not review that order.

motion to sever, "[t]he district judge must consider timely objections and modify or set aside any part of the order that is contrary to law or clearly erroneous." Fed. R. Crim. P. 59(a); *see also* 28 U.S.C. § 636(b)(1).

## II.      BEAULIEU'S OBJECTIONS

Beaulieu objects to the R&R on three grounds.  First, that the Magistrate Judge erred in determining that James' testimony justifying the initiation of the traffic stop was credible.  Second, that the Magistrate Judge erred in determining that James and Flanagan had reasonable articulable suspicion of criminal activity sufficient to extend the traffic stop in order to conduct a canine sniff search of the Jeep.  Third, that statements he made during custodial interrogations are inadmissible as fruits of the poisonous tree.  The Court will review these objections *de novo*.

### A.      The Initial Traffic Stop

Beaulieu first contends that James' testimony regarding why he initiated the traffic stop was not credible.  It is well settled that "[a]ny traffic violation, however minor, provides probable cause for a traffic stop."  *United States v. Bloomfield*, 40 F.3d 910, 915 (8th Cir. 1994).  In Minnesota, an observed seatbelt violation gives law enforcement officers probable cause to stop a vehicle independent of any other moving violations.  *See* Minn. Stat. § 169.686, subd. 1 ("Seat belt requirement"); *State v. Wendorf*, 814 N.W.2d 359, 361-62 (Minn. Ct. App. 2012).  Here, Beaulieu concedes that a passenger's failure to wear a seatbelt constitutes a traffic violation sufficient to justify a traffic stop.  The argument Beaulieu makes instead is that it would have been impossible for James to see

Alonzo's supposedly unsecured seatbelt strap, and therefore James' testimony lacks credibility.   But the Court is not persuaded.   James testified that he could see the unsecured strap when the two vehicles passed through an area illuminated by streetlights from an on-ramp.   The Magistrate Judge found this testimony to be credible, and the Court finds no reason to disagree – Beaulieu's objection is purely speculative.   By testifying that he could see Alonzo's seat belt strap hanging unsecured, James articulated a reasonable basis to suspect that Alonzo was not wearing a seatbelt.   Accordingly, James had probable cause to initiate the traffic stop.

### B.    Extension of the Traffic Stop

Beaulieu next contends that James and Flanagan illegally extended the scope of the traffic stop in order to conduct a canine sniff search of the Jeep, and that the Magistrate Judge's recommendation to the contrary was erroneous.   On this basis, Beaulieu argues that all evidence obtained as a result of the search must be suppressed.

During the course of a lawful traffic stop, "a police officer may conduct an investigation reasonably related in scope to the circumstances that justified the stop." *United States v. Anguiano*, 795 F.3d 873, 876 (2015).   This includes checking the driver's license, determining whether the driver has any outstanding warrants, inspecting the vehicle's registration, and issuing a citation or warning.   *Rodriguez v. United States*, 135 S. Ct. 1609, 1615 (2015).   But a police officer may not prolong the stop "'beyond the time reasonably required' to complete the mission of the initial seizure." *United States v. Stringer*, 739 F.3d 391, 395 (8th Cir. 2014) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)).   This rule applies not only to lengthy extensions of a traffic stop, but also to

*de minimis* extensions.  *Rodriguez*, 135 S. Ct. at 1615-16.  "Continued detention is constitutional, however, if an officer has reasonable suspicion that criminal activity is afoot."  *Stringer*, 739 F.3d at 395.

In evaluating reasonable suspicion, the Court "consider[s] the totality of the circumstances to determine, 'based on commonsense judgments and inferences about human behavior,' whether the trooper had 'at least a minimal level of objective justification' for prolonging the seizure."  *Id.* (citation omitted) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000)).  The Court also considers the "collective knowledge" of the law enforcement officers involved in the stop, provided that there was at least "some degree of communication" amongst them.  *United States v. Williams*, 429 F.3d 767, 772 (8th Cir. 2005) (citing *United States v. Gillette*, 245 F.3d 1032, 1034 (8th Cir. 2001)).  "The requirement that there be a degree of communication serves to distinguish between officers functioning as a 'search team,' and officers acting as independent actors who merely happen to be investigating the same subject."  *Gillette*, 245 F.3d at 1034 (citation omitted) (quoting *United States v. O'Connell,* 841 F.2d 1408, 1419 (8th Cir. 1988)).

Here, the Court finds that James and Flanagan did prolong the stop beyond the time necessary to investigate the seatbelt violation.  Once James checked Beaulieu's license and registration and issued the written warning, the traffic-related mission of the seizure was complete, and the traffic violation alone could not support prolonging the stop for the canine sniff search.  The Court nevertheless finds that the extension was constitutionally proper under the collective knowledge doctrine.  DEA Task Force

Officer Maloney, who was actively involved in the Beasley investigation, had a reasonable and articulable suspicion that the Jeep was transporting heroin, based on the following facts:  (1) telephone intercepts suggested that Beasley had traveled to Michigan in an attempt to procure heroin to bring back to Minnesota; (2) Maloney had reason to believe that Beasley had succeed in obtaining heroin and was traveling back to Minnesota because he turned off his cell phone – Maloney knew from prior phone intercepts and case work that Beasley typically shut off his phone when transporting drugs or money; (3) Maloney observed the Jeep at a hotel where Beasley and several of his associates were staying; (4) tips from informants and coconspirator's involved in Beasley's organization indicated that Beasley typically used a three car system to transport drugs, in which one car carried the drugs, one car carried firearms for protection, and one car carried Beasley; (5) Maloney observed Beasley and other known associates loading duffle bags into the Jeep; (6) Maloney observed three vehicles, including the Jeep, leave the hotel and head north; and (7) Maloney had grounds to believe that the Jeep was the most likely vehicle to be carrying drugs because it had a non-local license plate, it was not carrying Beasley or any of the investigation's other primary targets, it was carrying the most bags of the three vehicles, and it stopped for gas shortly after departing the hotel.

Maloney's knowledge was subsequently imputed to James and Flanagan – under the collective knowledge doctrine – when Maloney and his partner told the troopers that the Jeep was connected to an active DEA investigation and was suspected of transporting heroin, and requested that the officers conduct a "wall" stop of the Jeep. *See Williams*,

429 F.3d at 771-72 (finding that a radio request from one law enforcement officer to another in which the "only information transmitted was that there might be controlled substances in the car" was sufficient to trigger the collective knowledge doctrine).  At that point, James and Flanagan became part of the search team and thus had an imputed reasonable suspicion of narcotics trafficking that was constitutionally sufficient, on its own, to warrant prolonging the stop.

In addition to the collective knowledge imputed from Maloney and his partner, James and Flanagan made their own observations that further bolstered their already reasonable articulable suspicion of narcotics trafficking.  After initiating the stop, James observed that (1) Beaulieu was slow to pull over; (2) Alonzo was seated in the backseat even though the front passenger seat was unoccupied; (3) Defendants' were smoking freshly lit cigarettes; (4) Alonzo repeatedly interrupted when Beaulieu spoke to James; (5) James did not see in plain view any bags from Defendant's alleged shopping trip to Macy's; and (6) both passengers were visibly nervous.  Flanagan also knew from experience that the Jeep was traveling from a common narcotics source area, Minneapolis, to a common destination area, the Red Lake Reservation.  These observations, viewed through the lens of the troopers' knowledge that the DEA suspected the Jeep of carrying heroin, provide additional support for the extension of the stop.

In the R&R, the Magistrate Judge did not address the collective knowledge doctrine.[2]  Instead, in finding that James and Flanagan had a reasonable suspicion

---

[2] The Government did raise the issue.  In its briefing before the Magistrate Judge, the Government extensively recited the details of Maloney's DEA investigation, including all of the

(Footnote continued on next page.)

sufficient to justify the canine sniff search, the Magistrate Judge relied on only four of James' post-stop observations:  Alonzo was in the backseat, Defendants' were smoking freshly lit cigarettes, Alonzo repeatedly interrupted Beaulieu, and James did not see any Macy's bags in the Jeep.  Beaulieu, in his objection to the R&R, argues that each of these observations were of wholly innocent behaviors that cannot amount to reasonable suspicion, even when considered together.  The Court, however, need not confront the question of whether James' post-stop observations would have been enough, on their own, to support a finding of reasonable suspicion.  As explained above, James and Flanagan had an imputed reasonable suspicion of narcotics trafficking based on their radio communications with Maloney and his partner, which **alone** was enough to justify the *di minimis* extension of the stop.  And even if it was not enough, James and Flanagan also had a reasonable suspicion sufficient to justify extending the stop based on the imputed knowledge from Maloney and his partner **combined** with their own post-stop observations.

Accordingly, because James and Flanagan had a reasonable articulable suspicion of narcotics trafficking that was sufficient to justify extending the traffic stop in order to perform a canine sniff search of the Jeep, the Court will overrule Beaulieu's objection and adopt the Magistrate Judge's recommendation to the extent it is consistent with this Order.

_____

(Footnote continued.)

facts underlying his suspicion that the Jeep was transporting heroin.  (Gov't Mem. of Law in Opp. to Defs.' Mots. to Suppress Evid. & Statements at 2-5, Nov. 16, 2015, Docket No. 1,020.) The Government also argued that the collective knowledge of Maloney, James, and Flanagan justified both the initial stop and the canine sniff search.  (*Id.* at 9-10, 13.)

### C.      Beaulieu's Custodial Statements

Beaulieu's third objection relates to statements he made during custodial interrogations.  Beaulieu argues that these statements must be suppressed as "fruit of the poisonous tree" because they were obtained as a result of the unlawful traffic stop and canine sniff search.  *United States v. Simpson*, 439 F.3d 490, 493-94 (8th Cir. 2006) ("Under the 'fruit of the poisonous tree' doctrine, the exclusionary rule bars the admission of physical evidence and live witness testimony obtained directly or indirectly through the exploitation of police illegality." (quoting *Hamilton v. Nix*, 809 F.2d 463, 465 (8th Cir. 1987))).  But because the Court has already found that both the stop and the extended search were constitutionally proper, Beaulieu's fruit of the poisonous tree argument necessarily fails.  The Court will therefore overrule this objection.

### III.      ALONZO'S OBJECTIONS

Alonzo objects to the R&R on three grounds.  First, he argues that the Magistrate Judge erred in recommending that the Court deny his motion for severance.  Second, he argues that the Magistrate Judge erred in recommending denial of his motion to suppress evidence found in the Jeep.  Third, he argues that statements he made during a custodial interrogation are inadmissible as fruit of the poisonous tree.  The Court will review Alonzo's motion for severance objection under a clearly erroneous standard of review and his other objections *de novo*.  Fed. R. Crim. P. 59(a), (b)(1), (3); *see also* 28 U.S.C. § 636(b)(1).

### A.    Motion for Severance

Alonzo first contends that the Magistrate Judge erred in recommending that his motion for severance be denied.  When a defendant moves for severance, the Court must initially determine whether joinder was proper.  *United States v. Darden*, 70 F.3d 1507, 1526 (8th Cir. 1995).  Even when joinder is proper, however, a judge may still "order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires" if joinder "appears to prejudice" the defendant.   Fed. R. Crim. P. 14(a).  But, "the defendant seeking severance has the heavy burden of demonstrating that a joint trial will impermissibly infringe his right to a fair trial."  *United States v. Warfield*, 97 F.3d 1014, 1019 (8th Cir. 1996).   "[O]nly in an unusual case will the prejudice resulting from a joint trial be substantial enough to outweigh the general efficiency of joinder."  *United States v. Clay*, 579 F.3d 919, 927 (8th Cir. 2009) (citing *United States v. Al-Esawi*, 560 F.3d 888, 891 (8th Cir. 2009)).

Here, Alonzo does not appear to argue that joinder was improper.  Instead, he argues that a joint trial will prejudice his right to a fair trial.  In the R&R, the Magistrate Judge found that Alonzo failed to meet his high burden of establishing prejudice because he raised only conclusory and speculative arguments that the "the majority of the evidence" does not involve him and "[t]here is a conflict of interest between co-defendants."  The Magistrate Judge accordingly recommended that the Court deny the motion without prejudice.

In his objection to the R&R, Alonzo repeats the same arguments that he made to the Magistrate Judge, without providing any additional details and without citing any

pertinent case law.  On this bare record, the Court cannot find that the Magistrate Judge's recommendation was clearly erroneous.   Simply put, Alonzo's conclusory and speculative arguments are insufficient to show prejudice at this early stage of the case.  If at a later time Alonzo can articulate specific and concrete reasons for why severance is necessary, the Court will entertain a new motion to sever.  *United States v. Billups*, 442 F. Supp. 2d 697, 706 (D. Minn. 2006) ("Severance is a remedy that can be provided at the time of trial if appropriate under the circumstances.").  But for now, the motion is premature.  The Court will therefore overrule Alonzo's objection, adopt the Magistrate Judge's recommendation, and deny the motion to sever without prejudice.

### B.     Evidence Found in the Jeep

In his second objection, Alonzo argues that evidence from the Jeep must be suppressed because the traffic stop and canine sniff search were constitutionally improper.   Alonzo raises substantially the same arguments as Beaulieu, but these arguments fail for the same reasons set forth above – neither the stop nor sniff search violated Alonzo's Fourth Amendment rights.   The Court will therefore overrule this objection.

### C.     Alonzo's Custodial Statements

Alonzo's third objection relates to statements he made during a custodial interrogation.  Alonzo again raises substantially the same argument as Beaulieu:  his statements must be suppressed as fruit of the poisonous tree because they were obtained as a result of the unlawful traffic stop and canine sniff search.   But once more, because

the Court has already found that the traffic stop and sniff search were constitutionally proper, the Court will overrule this objection.

## ORDER

Based on the foregoing, all the files, records, and proceedings herein, the Court **OVERRULES** Defendant Beaulieu's objections [Docket No. 1,109]; **OVERRULES** Defendant Alonzo's objections [Docket No. 1,110] and **ADOPTS** the Report and Recommendation of the Magistrate Judge [Docket No. 1,057], but only to the extent it is consistent with this Order.  **IT IS HEREBY ORDERED** that:

1.    Defendant Beaulieu's Motion to Suppress Evidence and Statements [Docket No. 855] is **DENIED**.

2.    Defendant Alonzo's Motion for Severance or, in the Alternative, to Join the Co-Defendant's Motions [Docket No. 669] is **DENIED without prejudice**.

3.    Defendant Alonzo's Motion to Suppress Evidence Found in the Vehicle [Docket No. 671] is **DENIED.**

4.    Defendant Alonzo's Motion to Suppress Defendant's Statements, Admissions, and Answers [Docket No. 672] is **DENIED**.


DATED:  April 15, 2016                    ___s/ John R. Tunheim___
at Minneapolis, Minnesota.                    JOHN R. TUNHEIM
                                              Chief Judge
                                    United States District Court